# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.** | ) | |
| **READE MANUFACTURING COMPANY,** | ) | **FILED UNDER SEAL** |
| 100 Ridgeway Boulevard, | ) | |
| Manchester, NJ 08759, | ) | |
|  | ) | Civil Action No._____ |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| **ESM GROUP, INC.,** | ) | **JURY TRIAL DEMANDED** |
| 300 Corporate Parkway, 21 North, | ) | |
| AMHERST, NY 14226, | ) | |
|  | ) | |
| Defendant. | ) | |

_____)

## COMPLAINT

This complaint alleges that ESM Group, Inc. ("ESM") has been defrauding the United States and violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, through a scheme to import magnesium powder from China for military use.  ESM knowingly caused a military contractor to submit false claims to the U.S. Department of Defense for countermeasure flares that were nonconforming with contractual requirements and applicable military specifications in two respects: first, they were manufactured with Chinese-made ultra-fine magnesium powder, in violation of a requirement that the flares be manufactured with ultra-fine magnesium powder made in the United States or Canada; and second, they used a combination of ground ultra-fine magnesium powder mixed with atomized powder, in violation of a contractual requirement that the magnesium powder be either ground ultra-fine powder, or atomized powder, but not a combination of the two.  In addition, ESM caused and conspired with others to falsely represent

that the ultra-fine magnesium powder was magnesium desulphurization reagent, in order to defraud the United States Customs Service by avoiding a 305 percent customs duty applicable to ultra-fine magnesium powder.  Plaintiff Reade Manufacturing Company learned of the information set forth herein as a result of its own efforts, and it promptly disclosed this information to federal Government officials.  On the basis of the information disclosed by Plaintiff and described herein, federal officials commenced and pursued a criminal investigation that has resulted in a criminal indictment.  Plaintiff, by the undersigned counsel, brings this *qui tam* lawsuit on behalf of and in the name of the United States and for itself, and alleges:

## JURISDICTION AND VENUE

1.      Counts I-VIII are civil actions by Plaintiff Reade Manufacturing Company acting on behalf of and in the name of the United States, against Defendant ESM Group, Inc., under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

2.      This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because the Defendant is located and transacts business in this judicial district.

3.      Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because the Defendant is located and transacts business in this judicial district.

4.      Plaintiff contends that none of the allegations set forth herein was based upon a public disclosure of allegations or transactions, as those terms are used in 31 U.S.C. § 3730(e)(4).

5.      To the extent any allegation set forth in this Complaint may have been based upon any public disclosures, Plaintiff is permitted to proceed with this lawsuit because Plaintiff is an "original source" as that term has been defined in 31 U.S.C. § 3730(e)(4).

6.    In the summer of 2004, Plaintiff and another company, Hart Metals, Inc. ("Hart"), a corporate affiliate of Plaintiff, were the only approved North America-based producers of ultra-fine magnesium powder for use by the U.S. Department of Defense.  At that time, Plaintiff experienced a sudden, steep decline in its business of supplying the ultra-fine powder for a manufacturer of countermeasure flares for the U.S. Armed Services.  Thereafter, solely through its own observations and efforts, as will be set forth in more detail below, Plaintiff discovered the fraudulent activities that are set forth in this Complaint.  (*See* ¶¶ 26-39, *infra*.)  Plaintiff's knowledge of the fraudulent activities was both "direct" and "independent," within the meaning of 31 U.S.C. § 3730(e)(4).

7.    Plaintiff voluntarily provided its information about these fraudulent activities to officials from the U.S. Department of Homeland Security and the U.S. Department of Defense in March and April 2005, respectively.  Plaintiff continued to provide additional information to the Government throughout 2005 and 2006.  (*See* ¶¶ 40-55, *infra*.)  Prior to Plaintiff's disclosures of its information to federal Government officials, the United States Government had no knowledge of the fraudulent activities that are the basis of this lawsuit.

## PARTIES AND OTHER RELATED PERSONS

8.    Plaintiff Reade Manufacturing Company ("Reade," "Plaintiff," or "Relator"), d/b/a Magnesium Elektron Powders-NJ, is a producer of magnesium powders.  Reade is located at 100 Ridgeway Boulevard, Manchester, New Jersey 08759.  Reade has conducted operations at this location since 1941.  Reade is now a wholly-owned subsidiary of Magnesium Elektron, Inc., which is part of BA Holdings, Inc. of Riverside, California.  All actions attributed to Reade herein were actions of its agents acting within the scope of their employment or agency with Reade.

9.     Defendant ESM Group, Inc. ("ESM"), is located at 300 Corporate Parkway, 216 North, Amherst, NY 14226.  Since October 5, 2007, ESM has been a wholly-owned subsidiary of SKW Stahl-Metallurgie GmbH, a company based in Unterneukirchin, Germany.  ESM manufactures magnesium desulfurization products for use as reagents by steel manufacturers. All actions attributed to ESM herein were actions of its agents acting within the scope of their employment or agency with ESM.

10.    The United States Department of Homeland Security ("DHS") is an agency of the United States.  The United States Customs and Border Protection Agency ("Customs"), part of DHS, is responsible for enforcing customs laws for products imported into the United States.

11.    The United States Department of Defense ("DOD"), an agency of the United States, is responsible for entering into and administering contracts for the procurement of goods and services used by the various branches of the Armed Services.

## APPLICABLE LAWS, RULES, AND CONTRACTUAL PROVISIONS

A.  Military Requirements for Ultra-Fine Magnesium Powder.

12.    Fine magnesium powder is a highly volatile substance used in over 120 military applications, including the production of countermeasure flares used by military aircraft as a defense against incoming heat-seeking missiles.  Ultra-fine magnesium powder, in either ground or atomized form, is the principal component of the countermeasure flares.  DOD's specifications for ultra-fine magnesium powder suitable for use in flares are set forth in Mil-Specs MIL-DTL-382D (issued January 20, 1998 and superseding MIL-M-382C) and MIL-P-14067B.

13.    Under Section 806 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, the Secretary of the Army or his designee has the authority to restrict the

procurement of certain conventional ammunition to sources within the national technology and industrial base ("NTIB"). The Secretary of the Army has delegated this authority to the Assistant Secretary of the Army for Acquisition, Logistics and Technology ("ALT").

14.     Under the authority conferred under Section 806, the Assistant Secretary of the Army for ALT has determined that the ultra-fine magnesium powder used in countermeasure flares must be manufactured in the United States or Canada.

15.     DOD solicitations for the supply of countermeasure flares contain a clause known as the "US&C clause," with the caption, "RESTRICTION OF CRITICAL ITEMS AND COMPONENTS."

16.     The first subparagraph of the US&C clause states that certain listed items "are critical to the support of national defense items. As such, it is necessary to create and/or maintain a domestic capability for the production of these items and components by limiting production and procurement to the United States/Canadian industrial base."

17.     The second subparagraph of the US&C clause states: "Items listed in this paragraph, to include all components contained therein, down to but not including raw materials (unless a more stringent restriction applies as set forth elsewhere in this contract), must be manufactured, assembled, and tested in the United States or Canada. Raw material is defined as material in the mill forms and shapes normally produced for commercial use."

18.     The third subparagraph of the US&C clause states, "Components listed in this paragraph must be manufactured, assembled, and tested in the United States or Canada," and lists "Magnesium Powder."

19.     The fourth subparagraph of the US&C clause states: "the failure of the contractor or subcontractor(s) to comply with the terms of this clause shall be a material breach of the contract."

20.     To conform to contractual requirements, the ultra-fine magnesium powder in countermeasure flares must be either ultra-fine ground powder, or atomized powder, but cannot a mixture of the two forms of powder.

B.    Customs Duties for Imported Chinese Magnesium Powder and Magnesium Reagents.

21.     The United States Department of Commerce has issued an anti-dumping order, Order A-570-864-000, on magnesium imported from China.  As a consequence of this anti-dumping order, ultra-fine magnesium powder imported from China is subject to a duty of 305.56%.

22.     Excluded from the anti-dumping order and 305.56% duty are magnesium-based reagent mixtures containing 90% or less pure magnesium by weight and one or more of certain non-magnesium granular materials to make magnesium-based reagent mixtures.  If any such reagent mixtures are imported from China, they are subject to a duty of only 5%.

23.     A magnesium-based reagent is a mixture of relatively coarse magnesium powder and one or more other powdered materials.  When different materials are combined to form a "reagent," they are physically mixed in such a way that the original materials are no longer pure and cannot be separated from one another.  Magnesium-based reagent is intended to be pneumatically injected through a small orifice into molten iron ranging up to one-half inch in diameter.  In comparison to fine mesh magnesium powders, the reagent is significantly less expensive to produce, much less volatile, and serves different industrial purposes, with the primary one being desulfurization of hot metal in the steel-making process.  Because of the

difference in volatility between ultra-fine magnesium powder and magnesium-based reagents, the ultra-fine powder must be stored and shipped in steel drums, whereas the reagent is usually shipped in large supersacks.

24.     Magnesium powders produced from ingot made in China typically have a telltale property: they contain a relatively high concentration of silicon, which is generally not present in magnesium powders produced from ingot made in other areas of the world.

25.     In December 2001, in response to a request by Defendant ESM, the Department of Commerce issued a "scope ruling" stating that pure magnesium in granular form produced in Canada or another third country from pure magnesium ingots produced in China was within the scope of the antidumping duty order on pure granular magnesium imported from China.

## PLAINTIFF'S DISCOVERY OF THE FRAUDULENT CONDUCT

26.     In 2004, Reade and its corporate affiliate, Hart, knew they were the only US&C-approved suppliers of ultra-fine magnesium powder for use by DOD or the United States military services.

27.     Prior to the summer of 2004, Reade and Hart had derived a substantial portion of their business from supplying ultra-fine magnesium powder to Kilgore Flares Company ("Kilgore") for use in countermeasure flares to be sold to the United States military.

28.     In or about the summer of 2004, Kilgore informed Reade and Hart that Kilgore would not need to order ultra-fine magnesium powder from them, because Kilgore had found another source of ultra-fine magnesium powder at a significantly lower price than they were offering.

29.     Knowing that Reade and Hart were the only US&C-approved supplier of ultra-fine magnesium powder, and also knowing the costs involved in producing ultra-fine magnesium

powder in the United States, Reade concluded that Kilgore's new supplier was almost certainly importing ultra-fine magnesium powder from outside the United States, and most likely from China, the largest and least expensive source of fine magnesium powder.

30.    In early December 2004, Plaintiff set out to determine whether an entity within the United States was importing military grade ultra-fine magnesium powder from China.

31.    Prior to 2004, Plaintiff used a contact in China, referred to herein as "ABC," to locate and purchase supplies of magnesium.   In June 2004, Plaintiff employed ABC as an agent to assist with business in China.  On or about December 7, 2004, Plaintiff asked its agent ABC to obtain information about who in China might be producing military grade ultra-fine magnesium powder and exporting it to the United States.

32.    During the week following December 7, 2004, Plaintiff, acting through its agent ABC, discovered that there was a source in China that was providing ultra-fine magnesium powder to an American purchaser, William H. Nehill of the company International Technology Group, Inc. ("International Technology").  Plaintiff learned that the Chinese source, an entity known as "Hebi Grand," was shipping the ultra-fine magnesium powder in combination with rods of pure aluminum, with the ultra-fine magnesium powder comprising 90% of the weight of the product and the aluminum rods comprising the other 10% of the weight.  Plaintiff learned that the Chinese supplier was labeling the contents of the packages as "magnesium desulphurization reagent."  Plaintiff obtained a photograph of the contents of one such package, clearly showing the ultra-fine magnesium powder combined with the aluminum rods. (Photograph, Exhibit 1.)  Plaintiff understood that the recipient of the package could easily remove the aluminum rods from the shipment, leaving the ultra-fine magnesium powder intact.

33.    Through its agent ABC, Plaintiff also learned that the shipments were made using steel drums, which was the normal practice in transporting ultra-fine magnesium powder because of its high volatility.  Magnesium desulphurization reagent, by contrast, is more coarse and much less volatile than ultra-fine magnesium powder, and it is normally transported in supersacks, which are less costly to ship.

34.    By early January 2005, Plaintiff had learned that Greg Magness and his company, Superior Metal Powders, Inc. ("Superior Metals"), were offering to provide ultra-fine magnesium powder for use in military flares.  Plaintiff knew that Greg Magness had been the President of Defendant ESM and that he was still providing consulting and marketing services for ESM.

35.    On or about February 15, 2005, Plaintiff obtained documents known as Piers Reports that are records of shipments into the United States.  (Piers Reports, Exhibit 2.)  The reports restate information that the shipper includes on a bill of lading.  These reports indicated that on several occasions, a shipper in China was sending shipments to International Technology. The "commodity description" in the reports indicated that the shipments consisted of "magnesium desulphurization reagent" with a maximum of 90% magnesium and a minimum of 10% aluminum.

36.    On February 23, 2005, Plaintiff obtained a sample of ultra-fine magnesium powder that was being supplied by Superior Metals.  Plaintiff performed a chemical and microscopic visual analysis of the sample.  (Memo dated 3/15/05 re: Sample of Magnesium Powder, Exhibit 3.)  Through its analysis, Plaintiff determined several things.  First, the sample consisted of a fine grade of magnesium powder, suitable for military use, and, because of its volatility, unsuitable for most other applications such as desulphurization.  Second, there was a relatively high concentration of silicon present in the sample, indicating that the powder likely

was made from ingot that came from China.  Third, the visual analysis of the sample (using a microscope) revealed that some of the magnesium particles were irregular, grooved particles, indicating that they had been ground; other particles, however, appeared very spherical, indicating that they had been atomized.  In other words, the magnesium powder sample consisted of a mixture of ultra-fine ground and atomized particles.

37.    At the beginning of March 2005, Plaintiff confirmed that Greg Magness was supplying ultra-fine magnesium powder to Kilgore for use in countermeasure flares.  Plaintiff learned that Magness, the owner of Superior Metals and a consultant to (and former President of) ESM, was working with another person, Eldon Botts, in supplying the ultra-fine magnesium powder to Kilgore.

38.    Accordingly, by early March 2005, Plaintiff, acting solely through the efforts of its agents and employees, had evidence of the following: (a) Kilgore, which had previously been obtaining military grade ultra-fine magnesium powder from Plaintiff, was obtaining the powder from other sources; (b) sources in China were providing ultra-fine magnesium powder to sources in the United States, including International Technologies; (c) the powder was being falsely labeled as "magnesium desulphurization reagent," although it was actually ultra-fine magnesium powder mixed with pure aluminum nuggets that could easily be separated from the mixture without changing the nature of the ultra-fine magnesium powder; (d) the powder was being transported in steel drums instead of supersacks, which was consistent with the fact that it was ultra-fine magnesium powder rather than reagent; (e) Greg Magness, a consultant to and former President of ESM, was supplying Kilgore with military grade ultra-fine powder that was being manufactured in China; and (f) the military grade powder being supplied by Magness to Kilgore consisted of a mixture of ground ultra-fine and atomized powder.

39.    Plaintiff continued to investigate ESM's involvement in the activities described above. Plaintiff learned, for example, that other Chinese companies were shipping ultra-fine magnesium powder to companies in the United States, including Minmetals L.A., Inc. Plaintiff also obtained evidence, including shipping reports, showing that the ultra-fine magnesium powder from China was being shipped to ESM's address in Pennsylvania. (Import Bill of Lading, Exhibit 4.)

## PLAINTIFFS DISCLOSED THE FRAUDULENT CONDUCT TO THE GOVERNMENT

40.    In March 2005, Plaintiff contacted William Scopa, Chief of the Commercial Enforcement Branch of the U.S. Customs and Border Protection Agency, to arrange a meeting to discuss Plaintiff's findings with respect to the importation of ultra-fine magnesium powder from China.

41.    On March 18, 2005, Plaintiff met with Mr. Scopa, as well as two other officials from DHS: Joseph Hirtz, Program Manager for Commercial Fraud for U.S. Immigration and Customs Enforcement, and Vince Dantone, a Field Agent for Customs and Border Protection.

42.    During the March 18 meeting, Plaintiff described what it had learned about the scheme to import military grade ultra-fine magnesium powder from China. Among the materials provided by Plaintiff was an example of a military specification for flares, showing how the military required that the source of the magnesium be United States or Canada; photographs of fires from accidents involving magnesium, including an incident involving Defendant ESM; the photograph of the fine magnesium powder/aluminum mixture being imported from China (*see* Exhibit 1), and for purposes of comparison, another photograph showing what actual 90-10 desulphurization reagent looks like; the price being quoted by the Chinese source, and the fact that the price was inconsistent with the price of actual reagent; and Piers Reports showing the

importation of more than 500,000 pounds of the ultra-fine powder, labeled as "reagent," by International Technologies (*see* Exhibit 2). Plaintiff also disclosed that Superior Metals and its owner, Greg Magness, a consultant to and the former President of ESM, appeared to be involved in the scheme.

43.      Soon after this meeting, on March 31, 2005, Plaintiff learned that the drum containing the magnesium powder from which Plaintiff had obtained their sample for chemical analysis had a label indicating that it had come from Defendant ESM, 955 Saxonburg Blvd., Saxonburg, Pennsylvania 16056.

44.      Having now confirmed that ESM was involved in supplying ultra-fine magnesium powder, Plaintiff learned that officials of the various Armed Services would be visiting ESM on April 20, 2005. The apparent purpose of this visit was so the military could evaluate ESM as another potential domestic supplier of ultra-fine magnesium powder. Plaintiff invited these same officials to first conduct a site visit at Plaintiff's own facilities, so that Plaintiff could educate the officials about the processes involved in producing ultra-fine magnesium powder before the officials visited ESM. Plaintiff arranged for this site visit to occur on April 19, 2005, *i.e.*, the day before the officials visited ESM.

45.      On April 19, 2005, officials from the United States Army, Air Force, and Navy visited Reade's manufacturing facility in Manchester, New Jersey. These officials included David Dreifus, Rene Medina, Andy Schirack, Doug Stark, Bill Whitehead, and Jim Wejsa. During the visit, Plaintiff gave a detailed presentation showing the processes involved in ultra-fine magnesium powder production and, by walking the visitors through the facilities, demonstrating how ultra-fine magnesium powder was manufactured.

46.    At the conclusion this April 19, 2005 meeting, Mitchell Markovich, President of Reade, spoke directly with Jim Wejsa, Head of Engineering Division for the U.S. Army's Armament Research, Development, and Engineering Center ("ARDEC"), located in Picatinny Arsenal in New Jersey.  Markovich showed Wejsa the photograph of the fine magnesium powder mixed with aluminum (*see* Exhibit 1), and Markovich told Wejsa that Plaintiff believed ESM was supplying Kilgore with ultra-fine magnesium powder imported from China.

47.    On the next day, these military officials visited ESM's production facility in Pennsylvania.  Their visit was hosted by Doug Lee of ESM; Greg Magness, who was introduced as ESM's "marketing representative"; Eldon Botts, who was introduced as ESM's "technical representative"; and others, including Greg Magness' son Justin Magness.

48.    During the April 20, 2005 site visit, ESM told the military officials that although ESM did import some magnesium ingots from overseas sources for *commercial uses*, ESM procured its magnesium for United States *military uses* from a domestic source – U.S. Magnesium – and not from any Chinese source.  ESM further stated that it was grinding the magnesium into ultra-fine powder in a new building at ESM's own facility.  These statements by ESM concerning the source of its magnesium for military uses, and the place where the magnesium was ground into ultra-fine powder, were false.

49.    Although ESM represented that the fine grinding was taking place in the new building, ESM refused to let the military officials enter the new building or physically inspect the so-called grinding equipment where the grinding was supposedly taking place.

50.    After the tour of ESM's facilities, several of the military officials involved in the tour told Plaintiff that, as government representatives, they were convinced that ESM had a viable operation and could produce ultra-fine ground powder.  For example, Jim Wejsa told

Plaintiff that ESM "swore up and down" that as metal grinders they were legitimate, and that the ingot they used was domestic and from U.S. Magnesium. Wejsa stated that he felt no reason for the Government to doubt the legitimacy of ESM's grinding operations.

51.     Throughout 2005 and 2006, Plaintiff continued to provide information to various Government officials, including Agent Vince Dantone of Customs and Border Protection, concerning what they knew about Defendant ESM's unlawful activities. Among the additional information provided by Plaintiff was a copy of the "Import Bill of Lading Detail" showing that on August 9, 2005, a Chinese shipper had sent a shipment of over 15,000 kgs of magnesium powder in 80 drums destined for "955 Saxonburg Boulevard, Saxonburg, PA 16056" – *i.e.*, the address of ESM's facility in Saxonburg, Pennsylvania. (*See* Exhibit 4.)

52.     On or about May 9, 2006, Plaintiff met with and made another detailed presentation to officials of DOD concerning the unlawful activities of ESM and others. During this meeting, in addition to discussing much of the information they had already presented to the Government, Plaintiff communicated their growing concerns about Chinese ultra-fine magnesium powder imports into the United States.

53.     At this meeting, Plaintiff disclosed once again that ultra-fine magnesium powder was being shipped from a company in China to the address of ESM in Saxonburg, Pennsylvania. (*See* Exhibit 4). Plaintiff also disclosed that China Minmetals Group, through its wholly-owned subsidiary Minmetals L.A., was exporting ultra-fine ground and atomized magnesium powder to the United States. The use of these powders in U.S. military flares would violate the requirement that the magnesium for these products must originate from the United States or Canada.

54.     During this May 2006 meeting, Plaintiff also discussed the results of its analyses of ultra-fine magnesium powder samples it had obtained: the first, from Superior Metals in

March 2005, and the others, from two sources in China in April 2006.  In a slide highlighting the unusual silicon content in the Superior Metals sample, Plaintiff demonstrated that the ingot from which the powder was made could not have come from known magnesium producers in the United States or Canada, including U.S. Magnesium, Timminco and Norsk Hydro-Canada.  In another slide, Plaintiff indicated that the close correlation in silicon content between the sample from Superior Metals and two samples obtained directly from China proved that the ultra-fine magnesium powder in the Superior Metals sample most likely came from ingots produced in China.  (Power Point Slides, Exhibit 5.)

55.     At the May 2006 meeting, Plaintiff also alleged that ESM had not been forthright with the Government during the April 19, 2005 visit by Government officials to ESM's facility.

## THE FRAUDULENT CONDUCT

56.     Sometime in or before 2004, Greg Magness formed an entity called Superior Metal Powders, Inc., and William H. Nehill formed an entity called International Technology Group, Inc.  Magness had previously been the President of, and remained a consultant to, Defendant ESM, a company that manufactured magnesium desulphurization reagents.

57.     Sometime in or before 2004, Magness and Nehill, through their companies Superior Metals and International Technologies, respectively, started to import ultra-fine magnesium powder from sources in China, including a source known as Hebi Grand.  They arranged to supply the ultra-fine magnesium powder to Defendant ESM.  ESM, in turn, began to supply the ultra-fine magnesium powder to Kilgore, a United States-based manufacturer of military flares.

58.     Until the summer of 2004, Kilgore had purchased ultra-fine ground magnesium powder from Plaintiff Reade, the only approved North American-based producer of ultra-fine

ground magnesium powder for military use. In or about the summer of 2004, Kilgore stopped purchasing ultra-fine ground magnesium powder from Reade, which was a substantial loss of business.

A.     <u>False Claims for Countermeasure Flares Using Chinese Magnesium Powder.</u>

59.     In order to sell countermeasure flares to the Department of Defense or any of the military services within DOD, Kilgore must certify that the flares meet certain specifications, including the specification that the magnesium used in the flares was manufactured within the United States or Canada, *i.e.*, a certification of US&C origin.

60.     In order to make this certification of US&C origin, Kilgore demands and relies upon a certification from its supplier of the ultra-fine magnesium stating that the magnesium meets certain technical specifications, including US&C origin.

61.     Starting in or before 2004, Defendant ESM began obtaining shipments of ultra-fine magnesium powder that ESM knew was manufactured in and imported from China. Defendant ESM then sold this ultra-fine magnesium powder to Kilgore.

62.     Defendant ESM knew that the ultra-fine magnesium powder it was selling to Kilgore would be used in the manufacture of countermeasure flares, that Kilgore would be selling these flares to DOD and the military services within DOD, and that DOD would require Kilgore to certify the US&C origin of the magnesium.

63.     Knowing and intending that Kilgore would get paid by an officer or employee of the United States Government, ESM knowingly created false certifications stating that the ultra-fine magnesium powder ESM was selling to Kilgore was manufactured in conformance with all applicable military specifications, including the specification that the ultra-fine magnesium

powder used in the flares was manufactured within the United States or Canada, *i.e.,* certifications of US&C origin.

64.     Kilgore relied upon the false certifications of ESM that the ultra-fine magnesium powder used in the countermeasure flares was in conformance with applicable specifications, including the US&C requirement.  In reliance upon these false statements provided by ESM, Kilgore submitted false claims to DOD and the armed services within DOD, falsely representing that the countermeasure flares met all applicable specifications, including the US&C clause, when in fact the flares did not meet the specifications.

65.     Beginning in or prior to 2004, and continuing through 2006, officers or agents of the United States in fact purchased large quantity of these countermeasure flares from Kilgore, which flares consisted of ultra-fine magnesium powders procured from Defendant ESM, resulting in substantial damages to the United States.

B.     <u>False Claims for Flares Using Combination of Ground and Atomized Powders.</u>

66.     In order to sell countermeasure flares to the Department of Defense or any of the military services within DOD, Kilgore must certify that the flares meet certain contractual requirements, including the requirement that the magnesium used in the flares was either ultra-fine ground powder, or atomized powder, but not a combination of the two forms of powder.

67.     ESM knew that the magnesium powder was non-conforming with the contractual requirement that the magnesium powder either be ultra-fine ground powder, or atomized powder, but not a combination of the two forms of powder.  Nonetheless, ESM falsely certified to Kilgore that the ultra-fine magnesium powder met all applicable contractual requirements, including the requirement that the powder be either ultra-fine ground powder, or atomized powder, but not a combination of the two different forms.

68.     ESM knew and specifically intended that Kilgore would rely on this false certification and, in order to get paid by the United States, would submit a false certification to DOD or the armed services within DOD that the countermeasure flares conformed to all applicable requirements, including the requirement that powder be either ultra-fine ground powder or atomized powder, but not a mixture of the two forms.  Furthermore, ESM knew and specifically intended that Kilgore would be presenting false claims to officers or employees of the United States for these non-conforming countermeasure flares.

69.     In reliance on the false certifications provided by ESM, Kilgore did in fact submit false claims to officers or employees of the United States for payment for the non-conforming ultra-fine magnesium powder.

C.      "Reverse" False Claims Based on Avoiding Customs Duties.

70.     In order to make their scheme profitable, Superior Metals, International Technology, and ESM sought to improperly avoid the 305.56% duty placed on ultra-fine magnesium powder imported from China.  Accordingly, they engaged in a scheme to disguise the ultra-fine magnesium powder as magnesium desulphurization reagent, which was subject only to a 5% duty, and to falsely declare that the ultra-fine magnesium powder was magnesium desulphurization reagent.

71.     Instead of making true magnesium desulphurization reagent by mixing the magnesium powder with an appropriate inert substance, Superior Metals, International Technology, and ESM, acting in concert with one another and with their Chinese sources, arranged to have the pure ultra-fine magnesium powder packaged in steel drums with aluminum rods.  This would result in the drums containing less than 90% magnesium powder by weight, which – if the material were truly a magnesium reagent, as opposed to pure ultra-fine magnesium

powder – would exempt the material from the 305.56% duty.  When the drums reached the

United States, however, Superior Metals, International Technologies, and ESM would arrange to

have the aluminum rods separated from the ultra-fine magnesium powder, leaving only the pure

ultra-fine magnesium powder.

72.     By engaging in this scheme, ESM and the others were able to avoid the 305.56%

customs duty that should have been payable on the ultra-fine magnesium powder imported from

China.  ESM and the others specifically engaged in this conduct, which included the making of

false documents and false statements, knowing that they were unlawfully avoiding, and with the

specific intent to avoid, the payment of duties owed to the United States.

### COUNT I:  Knowingly Presenting False Claims - Chinese Origin of Magnesium
(31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009))

73.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1

through 72, as if fully set forth herein.  This Count is a civil action against Defendant for

violating 31 U.S.C. § 3729(a)(1) (2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) (2009), to

the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

74.     Defendant has knowingly caused to be presented false claims for payment to

officials or employees of the United States Government, in connection with the sale of

countermeasure flares manufactured with ultra-fine magnesium powder supplied from China.

75.     Because of the Defendant's conduct under this Count, the United States has

suffered actual damages of more than $40 million.

### COUNT II:  False Statements or Records - Chinese Origin of Magnesium
(31 U.S.C. § 3729(a)(2) (2008), § 3729(a)(1)(B) (2009))

76.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1

through 72, as if fully set forth herein.  This Count is a civil action against Defendant for

violating 31 U.S.C. § 3729(a)(2)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(B)(2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

77.    Defendant has knowingly made or used, or caused to be made or used, false statements regarding the origin of the ultra-fine magnesium powder used in countermeasure flares sold to the Government, for the purpose of getting false or fraudulent claims paid or approved by the Government.  Defendant has made or used these false statements, or caused them to be made or used, with the specific intent to get claims paid or approved by the United States Government.  The false statements were material to the Government's decisions to make or approve payments on the false claims.

78.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of at least $40 million.

### COUNT III:  Conspiracy to Submit False Claims - Chinese Origin of Magnesium
### (31 U.S.C. § 3730(a)(3) (2008), § 3729(a)(1)(C) (2009))

79.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(3)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(C)(2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

80.    Defendant ESM conspired with others to defraud the Government by getting false or fraudulent claims allowed or paid in connection with the sale of countermeasure flares manufactured with ultra-fine magnesium powder supplied from China.  ESM specifically intended for the Government to pay or allow false or fraudulent claims, and the conspiracy involved actions that were material to the Government's decision to pay or allow such claims.

81.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of at least $40 million.

**COUNT IV:  Knowingly Presenting False Claims - Mixing Magnesium Powders**
**(31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009))**

82.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(1) (2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) (2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

83.    Defendant has knowingly caused to be presented false claims for payment to officials or employees of the United States Government, based on the sale of countermeasure flares manufactured with a mixture of ground ultra-fine and atomized magnesium powder.

84.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of more than $40 million.

**COUNT V:  False Statements or Records - Mixing Magnesium Powders**
**(31 U.S.C. § 3729(a)(2) (2008), § 3729(a)(1)(B) (2009))**

85.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(2)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(B)(2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

86.    Defendant has knowingly made or used, or caused to be made or used, false statements regarding the composition of the ultra-fine magnesium powder used in countermeasure flares sold to the Government, for the purpose of getting false or fraudulent claims paid or approved by the Government.  Defendant has made or used these false statements, or caused them to be made or used, with the specific intent to get claims paid or approved by the United States Government.  The false statements were material to the Government's decisions to make or approve payments on the false claims.

21

87.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of at least $40 million.

### COUNT VI:  Conspiracy to Submit False Claims - Mixing Magnesium Powders
(31 U.S.C. § 3730(a)(3) (2008), § 3729(a)(1)(C) (2009))

88.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(3)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(C)(2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

89.    Defendant ESM conspired with others to defraud the Government by getting false or fraudulent claims allowed or paid in connection with the sale of countermeasure flares manufactured with a mixture of ground ultra-fine and atomized magnesium powder.  ESM specifically intended for the Government to pay or allow false or fraudulent claims, and the conspiracy involved actions that were material to the Government's decision to pay or allow such claims.

90.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of at least $40 million.

### COUNT VII:  Violation of "Reverse" False Claims Provision - Customs Duties
(31 U.S.C. § 3730(a)(7) (2008), § 3729(a)(1)(G) (2009))

91.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(3)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(C)(2009), to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

92.    Defendant ESM knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or

property to the Government in connection with customs duties that were owed on shipments of ultra-fine magnesium powder from China to entities within the United States.

93.    Because of ESM's conduct, the United States has suffered actual damages of at least $10 million.

**COUNT VIII:  Conspiracy to Violate "Reverse" False Claims Provision - Customs Duties**
(31 U.S.C. § 3729(a)(1)(G) (2009))

94.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 72, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(1)(C)(2009).

95.    Defendant ESM conspired with others to knowingly make, use, or cause to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Government in connection with customs duties that were owed on shipments of ultra-fine magnesium powder from China to entities within the United States.

96.    Because of ESM's conduct, the United States has suffered actual damages of at least $10 million.

**PRAYER FOR RELIEF**

Plaintiff demands judgment against the Defendant as follows:

a. That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That Plaintiff, as the *qui tam* Relator, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

c. That the Relator be awarded all costs of this action, including reasonable attorney's fees and court costs; and

d. That Plaintiff have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands that this matter be tried before a jury.

_____
Robert L. Vogel (RV-1527)
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Ave., N.W., 7th Floor
Washington, D.C. 20009
Tel. 202-537-5904/ Fax 202-537-5905
E-mail: robvogel@verizon.net

Attorney for Relator Reade Manufacturing Company

Dated: June 17, 2010